UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD MEIER,<br><br>   Plaintiff,<br><br>v.<br><br>ALLIED INTERSTATE, LLC,<br><br>   Defendant. | Case No.: 18-CV-1562-GPC-BGS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.**<br><br>**(ECF Nos. 24, 25.)** |

Richard J. Meier ("Plaintiff"), representing himself, has brought this action alleging that Allied Interstate, LLC, ("Defendant" or "Allied") contacted his cellphone using an automatic telephone dialing system ("ATDS") in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (ECF No. 1, Complaint.) Allied admits contacting Plaintiff but denies doing so using an ATDS. (ECF No. 4, Answer.)

On June 6, 2019, Defendant filed a motion for summary judgment. (ECF No. 24.) Plaintiff responded on June 21, 2019, (ECF No. 29), and Defendant replied on June 27, 2019. (ECF No. 30.) Acting in parallel, Plaintiff filed a motion for partial summary judgment on June 7, 2019. (ECF No. 25.) Defendant responded on June 21, 2019, (ECF No. 28), and Plaintiff replied on June 28, 2019. (ECF No. 33.)

On September 20, 2019, the Court held a hearing on the parties' summary judgment motions and took the motions on submission. (ECF No. 35.) On October 11, 2019, Defendant filed a notice of supplemental authority. (ECF No. 38.) Then, on October 14, 2019, Plaintiff filed a response and an amended response. (ECF Nos. 39, 40.)

Upon consideration of the facts, moving papers, and oral argument, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for partial summary judgment for the reasons stated in this order.

## I. Background

Allied Interstate is a third-party debt collector. (ECF No. 24-2, Kolosovskiy Decl. at ¶ 2.) Allied's primary business involves placing telephone calls to their clients' customers to collect outstanding debts. (*Id.*) In April 2019, Allied was hired by a client, Public Storage, to collect an outstanding debt from a customer, Mr. Chapman. (*Id.* at ¶ 3.) Between April 23 and May 23, 2018, Allied made approximately seventy-seven (77) collection calls to a phone number ending in 8428 in an attempt to reach Mr. Chapman. (*Id.* at ¶ 4; ECF No. 24-2, Ex. A, Allied Call Log.) Plaintiff Meier alleges that these calls went to his cellphone. (ECF No. 1, Complaint at ¶¶ 11–14.)

All 77 calls were made using a dialing system known as Live Vox Human Call Initiator ("HCI"). (ECF No. 24-1, Siegel Decl. at ¶ 20; ECF No. 24-2, Kolosovskiy Decl. at ¶ 6.) LiveVox HCI is one of four dialing systems available on a platform designed and operated by LiveVox. (ECF No. 25-4, Siegel Depo. at 8.)[1] Allied makes 10,000 or more calls via LiveVox HCI every day. (ECF No. 25-6, Kolosovskiy Depo. at 33.)

### a. Allied & the LiveVox Platform

The LiveVox Platform is a "comprehensive calling platform" that offers "four

---

[1] Pages numbers cited in Mr. Kolosovskiy and Mr. Siegel's depositions correspond with the pages of the transcript, not the pages of the filing.

separate outbound dialing systems," including "one automated outbound dialing system and three human initiated outbound dialing systems." (ECF No. 24-1, Siegel Decl. at ¶¶ 3, 5; ECF No. 25-4, Siegel Depo. at 41 ("one platform, multiple systems")). The four dialing systems – also referred to as "clouds" – are the Manual system, the HCI system, the Preview All System, and the Automated system. (ECF No. 25-4, Siegel Depo. at 8, 13.) This litigation concerns the HCI and Automated dialing systems.[2]

Allied "can use the LiveVox Platform to make phone calls, and when they make phone calls on the LiveVox Platform they can use one of [the] Four Clouds." (ECF No. 25-4, Siegel Depo. at 13.) More specifically, Allied has access to, and uses, at least three of the four dialing systems: the Manual system, Automated system, and HCI system. (ECF No. 25-6, Kolosovskiy Depo. at 43, 45–46.)[3]

To operate the dialing systems, LiveVox relies on two additional components named the Campaign Database and the Automatic Call Distributor ("ACD"). (ECF No. 25-4, Siegel Depo. at 10-17.) All four dialing systems utilize these components to create calling campaigns, store customer data, and route phone calls among LiveVox agents. (*Id.* at 10–17, 24, 28.) From LiveVox's perspective, however, the ACD and the Campaign Database are "not part of the HCI system." (*Id.* at 43.) Instead, "HCI is the queuer and the manual server." (*Id.*)

The LiveVox Platform also relies on two server pools – a manual media server pool and an automated media server pool – to operate the dialing systems. (ECF No. 25-

---

[2] The Court uses the terms "dialer" and "dialing system" interchangeably.

[3] Mr. Kolosovskiy stated that Allied had access to three LiveVox dialers: LiveVox HCI, manual, and predictive. (ECF No. 25-6, Kolosovskiy Depo. at 43, 45–46.) Because Mr. Kolosovskiy describes the "predictive" dialer as "dialing by a computer" and dialing that occurs when a "computer system initiates a call based on the agent's availability," (*id.* at 47), and because LiveVox purports to have only one non-manual dialer, (ECF No. 24-1, Siegel Decl. at ¶ 5), the Court can fairly infer that Mr. Kolosovskiy was referring to the Automated Dialer when he used the term "predictive."

4, Siegel Depo. at 7, 13.) The manual pool supports the HCI, Manual, and Preview All dialing systems, whereas the automated pool supports the Automated dialer. (*Id*. at 23.)

In providing these services, LiveVox "hosts the hardware and software for its outbound dialing systems at its own data centers." (ECF No. 24-1, Siegel Decl. at ¶ 4.) Defendant accessed the software through a secure online portal and did not download or install software on its computers to use LiveVox. (*Id.*; ECF No. 25-6, Kolosovskiy Depo. at 44.)

### b. Using LiveVox HCI

To use LiveVox HCI, a client, like Allied, must build a calling campaign. (ECF No. 25-4, Siegel Depo. at 13.) The client first transfers files to the LiveVox Platform containing any phone numbers and customer records to be called. (*Id*. at 12–13; ECF No. 25-6, Kolosovskiy Depo. at 21–23.) This information is stored on the Campaign Database – not in the HCI dialer. (ECF No. 25-4, Siegel Depo. at 12, 23–24.) Clients then choose "a bunch of different parameters" for the campaigns, including which dialer to use, whether to incorporate text messages, and how to engage with Caller ID. (*Id.* at 13, 29–31; *see also* ECF No. 37, Excerpts from the LiveVox User Manual).

Once the client designs the campaign, it may initiate the campaign by pressing "play." (ECF No. 25-4, Siegel Depo. at 15–16, 24–27.) This sends the customer's phone numbers from the Campaign Database to the ACD. (*Id*. at 16.) The ACD, in turn, "shows those telephone numbers to the clicker agent." (*Id*. at 17; ECF No. 25-6, Kolosovskiy Depo. at 24–27.)

A clicker agent is a person, working on behalf of LiveVox and its client, who initiates campaign phone calls by clicking on individual phone numbers. (ECF No. 25-4, Siegel Depo. at 14–16; ECF No. 25-6, Kolosovskiy Depo. at 21.) Clicker agents access these numbers through a client-specific "web portal" or online "interface." (ECF No. 25-4, Siegel Depo. at 13, 17–18.) To initiate a call, a clicker agent must click "on each and every number individually." (ECF No. 25-6, Kolosovskiy Depo. at 21, 35, 38; ECF No.

24-1, Siegel Decl. at ¶ 8.)

Once, the clicker agent clicks on a phone number, the LiveVox Platform sends the call "over to the HCI queuer," then "to the manual media server pool," and finally out to the Public Switched Telephone Network (PSTN)[4] to connect with the customer. (ECF No. 25-4, Siegel Depo. at 14–15, 20.) The manual media server pool can detect whether an answering machine or a person (i.e., the customer) answers the call. (*Id*. at 22.) If a person answers, then the call is re-routed to a closer agent by the ACD. (*Id*. at 22, 28.)

"The closer agent is the agent designated by the LiveVox customer (in this case, Allied) to speak with the" customer. (ECF No. 24-1, Siegel Decl. at ¶ 9; ECF No. 25-6, Kolosovskiy Depo. at 29, 42.) Closer agents access the calls by logging into a client-specific, online portal hosted by the ACD. (ECF No. 25-4, Siegel Depo. at 18.) Then, they click on numbers displayed through the portal to join a call. (*Id*. at 19.) If no closer agents are available to speak with a customer, then the clicker agents' screens do not display phone numbers and no calls can be made. (*Id.* at 17–19; ECF No. 25-6, Kolosovskiy Depo. at 30.) A closer agent is available if he is logged into the ACD, "in the ready stage and not on a phone call." (ECF No. 25-4, Siegel Depo. at 18, 19.)

A client can "pause" or "stop" a campaign at any time. (*Id.* at 33.) Once stopped, a client can re-start the campaign. (*Id.*) This is called "re-queue[ing]" the campaign. (*Id.*) When re-queueing a campaign, the client must re-select the campaign's parameters. (*Id*. at 34–35.) The client can, for example, change the dialing system used by the campaign. (*Id.* at 40–41.) A client need not re-upload their customers' phone numbers as the files

---

[4] In plain terms, the PSTN is the "wired telephone network that reaches into virtually every American home." Kevin Werbach, *No Dialtone: The End of the Public Switched Telephone Network*, 66 FED. COMM. L.J. 203, 208 (2014); *see also* 47 C.F.R. § 20.3 (defining the "Public Switched Network" ("PSN") as "[a]ny common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that uses the North American Numbering Plan in connection with the provision of switched services.").

from the prior campaign remain stored in the Campaign Database and available for future use. (*Id.* at 35, 37-39; ECF No. 37, Excerpts from the LiveVox User Manual at 18–20.) If a client alters the dialing system for a campaign, the clicker agent must log out of HCI to re-access the campaign. (ECF No. 24-1, Siegel Decl. at ¶ 10.)

### c. Using the Automated dialer

Like the HCI dialer, building a calling campaign in the Automated dialer begins with the client uploading a file to LiveVox. (ECF No. 25-4, Siegel Depo. at 26.) The client then chooses the Automated dialer, among the various parameters available when making a campaign, and hits "play" to launch the campaign. (*Id.* at 26, 27.)

Once the client hits "play," the "automated system will dial the . . . records in that campaign . . . in order to keep the [closer] agents occupied." (*Id.* at 27.) Different to the HCI dialing system, no clicker agents are needed to initiate each call. (*Id.*) The Automated dialer also routes the call differently, sending each call first through the "automated queuer," and then to the "automated server pool," before launching the call out onto the PSTN. (*Id.*)

If a live person answers the call, the ACD "connects the closer agents with" them. (*Id.* at 28.) As with the HCI dialer, the automated system will only "dial the campaigns" once the "[closer] agent is logged in." (*Id.* at 27.)

## II. Standard of Review

Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if "a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (quoting *Anderson.*, 477 U.S. at 247). Conversely, "[w]here the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden is met if the nonmoving party fails to make a showing sufficient to establish an element of his or her claim. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325.

When evaluating a motion for summary judgment, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The court may not, however, engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts as those functions are for the trier of fact. *Anderson*, 477 U.S. at 255. Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Anderson.*, 477 U.S. at 250–51.

## III. Analysis

The question presented by the competing motions for summary judgment is whether LiveVox HCI, by itself or as part of the LiveVox Platform, constitutes an ATDS under the TCPA. Defendant argues that the LiveVox HCI system is not an ATDS under the TCPA because the system requires manual human intervention to initiate each call and thus it cannot dial "automatic[ally]." (ECF No. 24 at 8; ECF No. 28 at 9.)

Meanwhile, Plaintiff argues that LiveVox HCI is part of one platform with four dialing systems, including an automatic system, and thus has the "capacity" to function as an ATDS. (ECF No. 25-1 at 7–10.)

In light of the Parties' arguments and the applicable law, the Court finds that LiveVox HCI is not an ATDS, when considered independently or as a component of the LiveVox Platform.

### a. The TCPA's Regulatory Framework Was Largely Vacated in 2018.

Congress passed the TCPA on December 20, 1991 to "protect the public from unsolicited telephone" calls. S. REP. NO. 102-177, at 9. Such calls were deemed "an impediment to interstate commerce, and a disruption to essential public safety services." *Id.* Congress found that enacting federal legislation was "necessary to protect customers from the growing invasion of their privacy rights." *Id.* at 7.

To effectuate this purpose, the TCPA makes it unlawful "to make any call . . . using an automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). An ATDS is defined as any "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). To establish a TCPA claim, a plaintiff must prove that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

Over the last 30 years, technology has developed and created new dialing systems capable of making intrusive, unsolicited calls. *See* David Kalat, *How to Recognize Different Types of Dialers from Quite A Long Way Away*, 72 CONSUMER FIN. L.Q. REP. 212, 218–20, 223–27 (2018) (describing the development of predictive dialers and autodialers). In response, the Federal Communications Commission (FCC) has promulgated multiple, lengthy regulations governing the TCPA's application and

8

attempting to define what constitutes an ATDS. *See*, *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7,961 (2015) ("*2015 Ruling*"); *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15,391 (2012); *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (2008); *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14,014 (2003).

As is evident from these regulations, the word "capacity" has generated substantial confusion as to whether TCPA liability can arise from an equipment's "potential functionalit[y]" to make automatic calls, or whether the equipment must have had the "present ability" to do so when the calls were made. *See 2015 Ruling* at ¶¶ 18–20, 30 F.C.C. Rcd. at 7975–76. In its *2015 Ruling*, the FCC purported to remedy this confusion by deciding in favor of the former definition. Specifically, the FCC held that "the capacity of an [ATDS] is not limited to its current configuration but also includes its potential functionalities," *id.* at ¶ 16, 30 F.C.C. Rcd. at 7974, counting those achieved through "the addition of software." *Id.* at ¶ 18, 30 F.C.C. Rcd. at 7975. In its clarification, the FCC reaffirmed its position that, under the TCPA, an ATDS is dialing equipment that "has the capacity to store or produce, and dial random or sequential numbers . . . even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." *Id.* at ¶ 10, 30 F.C.C. Rcd. at 7971–72.

In March 2018, the United States Court of Appeals for the District of Columbia Circuit struck down the *2015 Ruling*, holding that the FCC's newfound definition of an ATDS constituted an "unreasonably expansive interpretation of the statute." *ACA International v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 692 (D.C. Cir. 2018) ("*ACA Int'l*"). The D.C. Circuit scrutinized the FCC's statutory interpretation of the term "capacity," finding that FCC's interpretation was "utterly unreasonable in the breadth of its regulatory [in]clusion" because a "straightforward reading of the Commission's ruling invites the conclusion that all smartphones are autodialers." *Id*. at 697, 699.

9

18-CV-1562-GPC-BGS

Since the FCC's interpretation of an ATDS was struck down, all that remains is the statutory definition of ATDS by Congress. *Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1150 (9th Cir. 2019) (finding that *ACA Int'l* "wipe[d] the definitional slate clean," and overturned the preceding FCC regulations interpreting § 227(a)(1)).

### b. Based on the TCPA's Plain Language, the LiveVox HCI Does Not Dial Numbers Automatically.

Defendant argues that there is no dispute that the subject calls were made using the LiveVox HCI system, which involves the clicker agents, and therefore does not qualify as an ATDS. (ECF No. 24 at 8; ECF No. 28 at 9.) The primary question is thus whether the clicker agents' conduct renders the HCI dialer non-manual. The Court finds that it does.

The essential function of an ATDS is the capacity to dial numbers without human intervention. 47 U.S.C. § 227(a)(l). "By referring to the relevant device as an '*automatic* telephone *dialing* system,' Congress made clear that it was targeting equipment that could engage in automatic *dialing*, rather than equipment that operated without any human oversight or control." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018), cert. dismissed, 139 S. Ct. 1289 (2019) ("*Marks*") (citations omitted) (emphasis in original); *see also ACA Int'l*, 885 F.3d at 703 (noting that the "auto" in the word "autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.")).

However, the *Marks* court recognized that "human intervention of *some sort* is required before an autodialer can begin making calls." *Id.* at 1052–53 (emphasis added). The Court cited examples of permissible levels of intervention, such as: "turning on the machine," "initiating [the equipment's] functions," or "flip[ing] the switch on an ATDS." *Id.* In addition, "the test for human involvement looks to the time a call or message is sent or dialed, not what might have happened *earlier* to enter the phone number into the system." *Washington v. Six Continents Hotels, Inc.*, No. 216-CV-03719-ODW, 2018 WL

10

4092024, at *5 (C.D. Cal. Aug. 24, 2018) (citation omitted) (emphasis added).

Here, the Court finds that the LiveVox HCI system is incapable of "non-manual" dialing because it requires the intervention of clicker agents, and thus is not an ATDS. Though a simple click on a computer screen "may seem [too] minimal" an act of human intervention, it is not in aggregate. *Collins v. Nat'l Student Loan Program*, 360 F. Supp. 3d 268, 273 (D.N.J. 2018). The HCI dialer's "[o]ne click, one call" model requires that a clicker agent "click each and every [customer's] number individually to initiate the call." (ECF No. 25-6, Kolosovskiy Depo. at 21; ECF No. 25-4, Siegel Depo. at 27). Consequently, the clicking does not just "turn[] on the [equipment]" as if through the "flip [of a] switch." *Marks*, 904 F.3d at 1052–53. Rather, the clicker agents must continue to click on each call throughout the campaign, and thus the agents' conduct is contemporaneous with the dialing. This differs starkly to the conduct required to initiate the campaign, namely, the client's one-time decision to hit "play." (ECF No. 25-4, Siegel Depo. at 15–16, 24–27.)

Defendant's Automated dialer makes this distinction even more clear. The Automated dialer "dial[s] the campaigns" in a manner that "keep[s] the [closer] agents occupied." (ECF No. 25-4, Siegel Depo. at 27.) Thus, initiating an automatic call sequence merely requires that (1) the client hit "play" on their campaign and (2) the closer agents be "logged" in. (*Id.*) In contrast to the HCI dialer, the Automated dialer requires no human intervention to place each call. (*Compare* ECF No. 25-6, Kolosovskiy Depo. at 47 (defining the Automated dialer as "dialing by a computer") *with* ECF No. 24-1, Siegel Decl. at ¶ 19 ("HCI cannot be turned on or triggered by a person, then left alone to launch calls")). Thus, the Automated dialer relies exclusively on the "system" to dial "non-manual[ly]." *See Marks*, 904 F.3d at 1052 (quoting *ACA Int'l*, 885 F.3d at 703); (ECF No. 25-4, Siegel Depo. at 27). Consequently, in comparing the dialers, the result is clear: LiveVox HCI is not an ATDS.

Other LiveVox HCI cases also support this conclusion. *See, e.g.*, *Ammons v.*

11

18-CV-1562-GPC-BGS

*Diversified Adjustment Serv., Inc.*, No. 18-CV-06489-ODW, 2019 WL 5064840, at *5 (C.D. Cal. Oct. 9, 2019) ("LiveVox HCI still requires human intervention to launch calls to them"); *Collins*, 360 F. Supp. 3d at 270 (same); *Hatuey v. IC Sys., Inc.*, No. 16-CV-12542-DPW, 2018 WL 5982020, at *6–7 (D. Mass. Nov. 14, 2018) (same); *Fleming v. Associated Credit Servs., Inc.*, 342 F. Supp. 3d 563, 577 (D.N.J. 2018) (same); *Schlusselberg v. Receivables Performance Mgmt., LLC*, No. CV 15-7572-FLW, 2017 WL 2812884, at *4–5 (D.N.J. June 29, 2017) (same); *Arora v. Transworld Sys. Inc.*, No. 15-CV-4941, 2017 WL 3620742, at *3 (N.D. Ill. Aug. 23, 2017) (same); *Smith v. Stellar Recovery, Inc.*, No. 15-CV-11717, 2017 WL 1336075, at *5–7 (E.D. Mich. Feb. 7, 2017) ("*Smith I*"), report and recommendation adopted, No. 15-CV-11717, 2017 WL 955128 (E.D. Mich. Mar. 13, 2017), reconsideration denied, No. 15-CV-11717, 2017 WL 1362794 (E.D. Mich. Mar. 29, 2017) (same); *Pozo v. Stellar Recovery Collection Agency, Inc.*, No. 8:15-CV-929-T-AEP, 2016 WL 7851415, at *1 (M.D. Fla. Sept. 2, 2016) (same). Likewise, the "overwhelming weigh of authority" on "point-and-click systems," of which LiveVox HCI is one, shows they do not qualify as ATDS equipment "in light of the clicker agent's human intervention." *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 3707283, at *9 (N.D. Cal. Aug. 3, 2018) (quoting *Marshall v. CBE Group, Inc.*, No. 16-CV-02406, 2018 WL 1567852 (D. Nev., March 30, 2018)).

Accordingly, the Court agrees with Defendant that the LiveVox HCI dialing system cannot engage in automatic dialing and, on its own, does not qualify as an ATDS.

### c. The Court Will Not Treat the LiveVox Platform as the Equipment at Issue.

The above analysis does not resolve the question of whether LiveVox HCI, as an integral part of a platform that contains an automated dialer, qualifies as "equipment which has the capacity . . . to dial such numbers." 47 U.S.C. § 227(a)(l). To answer this question, the Court must evaluate LiveVox HCI in light of 47 U.S.C. § 227, *ACA Int'l*, and Ninth Circuit law. In doing so, the Court concludes that the "equipment" at issue is

the HCI dialer, and *not* the LiveVox Platform as a whole. Thus, Plaintiff's argument fails.

### i. The Term "Capacity" Remains Undefined.

First, because Plaintiff's argument hinges on the term "capacity," the Court must address what it means for an ATDS to have the "capacity" to dial numbers automatically. (ECF No. 25-1 at 7–11.)

The Ninth Circuit most recently interpreted "capacity" in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). There, the *Satterfield* court emphasized that the TCPA's "clear language mandates that the [court's] focus be on whether the equipment has the [requisite] *capacity*." *Id.* (emphasis in original). Thus, the equipment at issue "need not actually" function as an ATDS. *Id.* The *Satterfield* court "recognized that the definition of an ATDS . . . swept more broadly than a device's present use precisely because the statute used the term 'capacity.'" *King v. Time Warner Cable Inc.*, 894 F.3d 473, 480 n.7 (2d Cir. 2018); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

More recently, however, the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, undermined that understanding. In *Marks*, the court found that "the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *Marks*, 904 F.3d at 1052. In a footnote, the *Marks* court then cited *Satterfield*, but explicitly declined to address whether "capacity" had to be "current" or "potential." *Marks*, 904 F.3d at 1053 n.9 ("we decline to reach the question whether the device needs to have the current capacity to perform the required functions or just the potential capacity to do so").

The Ninth Circuit's declination to meet this question head on can be understood as a reaction to *ACA Int'l*. After all, the *Marks* court discussed *ACA Int'l* at length, and "ordered supplemental briefing" to address its "impact." *Marks*, 904 F.3d at 1049. As to

13

capacity, *ACA Int'l* offers important guidance.[5] There, the D.C. Circuit observed that, the question of "whether equipment has the 'capacity' to perform the functions of an ATDS ultimately turns less on labels such as 'present' and 'potential' and more on considerations such as how much is required to enable the device to function as an autodialer." *ACA Int'l*, 885 F.3d at 696. That is because even the narrowest definition of the term capacity "contemplates some future functioning state, along with some modifying act to bring that state about." *Id*.

Hence, courts are to determine the scope of an equipment's "capacity" by asking, in short, "how much is required to enable the device to function as an autodialer." *Id*. In other words, "does [the equipment] require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?" *Id.* Courts must also consider "what kinds (and how broad a swath) of telephone equipment might then be deemed to qualify as an ATDS subject to the general bar against making any calls without prior express consent." *Id.*

### ii. The Equipment is the HCI Dialer – not the LiveVox Platform.

Of course, the courts' reasonings in *Satterfield*, *Marks*, and *ACA Int'l* do not expressly address the issue before the Court either, namely, whether LiveVox HCI can be considered an ATDS because it is a component of the larger LiveVox Platform, which in turn contains an automatic dialer, the Automated Dialer.

Though the Ninth Circuit has not addressed this question, the FCC faced a related issue in 2015.[6] There, a petitioner asked the FCC to determine if text messages, sent

---

[5] Though decided out-of-circuit, *ACA Int'l* has been treated as binding by various district courts of the Ninth Circuit since the decision was rendered. *See Washington*, 2018 WL 4092024, at *2; *Singer v. Las Vegas Athletic Clubs*, 376 F. Supp. 3d 1062, 1068 n.2 (D. Nev. 2019); *Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 797 n.5 (D. Ariz. 2018); *but see Perez v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2019 WL 1491694, at *7 (N.D. Cal. Apr. 4, 2019) ("As the Court has previously noted, the D.C. Circuit's decision in [*ACA Int'l*] is not binding upon this Court.")

[6] Importantly, the Court recognizes that *ACA Int'l* struck the FCC's *2015 Ruling*, and that it thus does

14

automatically to the petitioner and without his consent, qualified an ATDS where "separate equipment," owned by "two companies," was used to complete "the storage and calling functions." *2015 Ruling* at ¶ 23, 30 F.C.C. Red. at 7977–78. The FCC ruled that "parties cannot circumvent the TCPA by dividing ownership of dialing equipment." *Id.* The FCC reasoned that "such equipment can be deemed an autodialer if the *net result* of such voluntary combination enables the equipment to" function as an ATDS. *Id* at ¶ 24, 30 F.C.C. Red. at 7978 (emphasis added). The FCC further observed that the "TCPA uses the word 'system' to describe the automated dialing equipment that is defined in section 227(a)(1)," and thus two pieces of equipment working together could be understood a single ATDS. *Id.*

Plaintiff's argument is consistent with the reasoning of the FCC's *2015 Ruling* in so far as LiveVox, who was hired by Defendant, has voluntarily structured each dialer to depend on a common Campaign Database and ACD. *Id* at ¶ 24, 30 F.C.C. Red. at 7978 (emphasis added). The facts show that is the case. All four dialers require the Campaign Database and the ACD to make calls. (ECF No. 25-4, Siegel Depo. at 10–17, 24, 28.) The Campaign Database stores the call records to be used by all LiveVox dialers and permits LiveVox's clients to create campaigns. (*Id.* at 12, 24.) Once the client kicks off the campaign, the records move from the Campaign Database to the ACD, which then presents them to clicker agents to initiate each HCI call. (*Id.* at 15–16.) The closer agents, moreover, must also log onto the ACD before receiving calls from the Automated and HCI dialers. (*Id.* at 18, 27.) Lastly, when a customer answers a LiveVox call from either dialer, the ACD connects that call to the closer agent. (*Id.* at 20–21, 28.)

---

not carry precedential value. The specific point at issue here, however, was not the focus of the D.C. Circuit's opinion in *ACA Int'l*. Moreover, the *2015 Ruling* evinces a reasoned interpretation of the TCPA as to this narrow issue. Thus, as the Court is unaware of any opinion finding explicitly that physically separate machines cannot be considered a single ATDS when used together, the Court refers to the *2015 Ruling* to illustrate this proposition here.

In addition, the Court recognizes that very little "is required" for a client to switch the dialer in a campaign and thus "enable the [Platform] to function as an autodialer." *ACA Int'l*, 885 F.3d at 696. As Plaintiff explains with reference to the LiveVox User Manual, a client with access to the Automated dialer can change dialers and begin launching automatic calls in a matter of clicks. (ECF No. 33 at 3–4 (citing ECF No. 37, Excerpts from the LiveVox User Manual)). First, the client clicks the "stop" on any active campaign. (*Id.*) Then, the client clicks "requeue." (*Id.*) Next, the client selects an alternate dialer from a drop-down menu for "Campaign Type." (*Id.*) Finally, the client clicks "requeue" once more. (*Id.*) At this point, the client need only click "play" and the campaign can begin again with a new dialer. (*Id.*) Importantly, a client does not need to "reload" the customers' phone numbers onto the Campaign Database as the Platform retains them for future use. (*Id.*) And, no "software changes" or "app downloads" are required to switch to the Automated dialer and thereby transform the LiveVox Platform into an ATDS. *ACA Int'l*, 885 F.3d at 694, 696, 700.[7]

However, these arguments fail to account for critical differences between the various dialers, and incorrectly analyze the equipment at issue under *ACA Int'l*. Here, "LiveVox has also gone to significant lengths to keep the HCI software and hardware separate from, and stored on different servers than, its automated dialing system," such

---

[7] Defendant also presents two out-of-circuit district court cases, *Collins* and *Smith*, to address Plaintiff's argument that the Court should consider the overall LiveVox Platform. Because the *Collins* court considered whether the equipment had the present or potential capacity to act as an ATDS, as required under Third Circuit precedent and in contrast to the guidance of *ACA Int'l*, *Collins* is inapposite. *See Collins v. Nat'l Student Loan Program*, 360 F. Supp. 3d 268, 274 (D.N.J. 2018) (finding the lack of evidence that LiveVox HCI had the "present capacity" to autodial calls dispositive). Likewise, because the *Smith* court rendered a decision prior to the passage of *ACA Int'l*, the Court does not rely on it here. *Smith v. Stellar Recovery, Inc.*, No. 15-CV-11717, 2017 WL 1336075, at *5 (E.D. Mich. Feb. 7, 2017), report and recommendation adopted, No. 2:15-CV-11717, 2017 WL 955128 (E.D. Mich. Mar. 13, 2017) (finding "Plaintiff did not present proof to dispute" the allegation that the HCI dialer operates independently from the other dialers).

that the Court should consider the Automated and HCI dialers as equipment distinct from the LiveVox Platform and from each other. (ECF No. 24 at 10) (commas added). The two dialers have different queuers responsible for sending calls out into the PSTN. (ECF No. 25-4, Siegel Depo. at 14–15, 27–28.) The two dialers also operate using different server pools, and the HCI server can only recognize call requests from "the HCI agent presentation layer." (ECF No. 24-1, Siegel Decl. at ¶¶ 7, 13.) The HCI dialer, moreover, requires the participation of clicker agents, and is "not capable of launching calls in an automated fashion," while the Automated dialers excludes them. (*Id.* at ¶¶ 2, 8–10.) Mr. Siegel, moreover, avers that the HCI dialer consists only of the "queuer and the manual media server," (ECF No. 25-4, Siegel Depo. at 43), and that the two dialers are "separated . . . at the hardware and software level." (ECF No. 24-1, Siegel Decl. at ¶ 6.) As it is uncontested then that the subject calls were only made using the HCI dialer, these differences underscore LiveVox and Defendant's voluntary election to avoid the use of an automatic dialer. (*Id.* at ¶ 20; ECF No. 24-2, Kolosovskiy Decl. at ¶ 6.)

In addition, Plaintiff is incorrect to assert that the Court should look to the Platform because a client can easily move from dialer to dialer as the TCPA's focus is whether the "*equipment* . . . has the capacity . . . to dial such numbers," 47 U.S.C. § 227(a)(1) (emphasis added), not the equipment's user. And, here, the HCI dialer itself lacks any "features" that may "enable auto-dialing." (ECF No. 24-1, Siegel Decl. at ¶¶ 12.) It contains "software . . . designed only to enable the type of calls launched in HCI" and has no "external application programming interface . . . to add software to the system." (ECF No. 24-1, Siegel Decl. at ¶¶ 6, 13). Hence, transforming the HCI dialer into an ATDS would require some "reconstruction," and certainly more than the "simple flipping of a switch." *ACA Int'l*, 88 F.3d at 696.

Addressing this question through the perspective of the actual equipment used to make the subject calls, moreover, makes sense given the technical advancements that are being made today, which include use of the cloud for storage of mass amounts of

17

information. This limitation reasonably cabins liability to telemarketers' voluntary actions, and eliminates liability arising from technical components of a dialing system that Defendant elected not to use and has sought to avoid. After all, courts should "construe the language [of a statute] so as to give effect to the intent of Congress," *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940), and Congress did not intend to punish companies or individuals who take pains to make commercial calls in compliance with the law. *See* H.R. REP. 102-317, at 6 (recognizing that "[w]hen conducted properly, unsolicited commercial calls . . . are an established lawful marketing practice"); *see also* Stuart L. Pardau, *Good Intentions and the Road to Regulatory Hell: How the TCPA Went from Consumer Protection Statute to Litigation Nightmare*, 2018 UNIV. OF ILL. J. OF L., TECH. & POL'Y 313, 319 (2018) ("Despite the considerable backlash against telemarketing, review of the bill's legislative history makes clear that the TCPA was not designed to inhibit legitimate business-to-consumer telephone communications"). Moreover, if the Court found that the "equipment" at issue included any accessible dialers that shared a database with the one used, then a broad "sweep" of equipment might qualify as an ATDS simply because it shares a database or an internal component with an ATDS. *ACA Int'l*, 885 F.3d at 697.

In sum, here, Allied used the combination of the Campaign Database, Automatic Call Distributor, HCI queuer, and manual server pool to make the subject calls. It did not use the Automated queuer or the Automated server pool. The Court concludes that these four selected components make up the "equipment" for purposes of evaluating the claims in this matter. Since the net result of this combination does not permit automatic dialing, and this limitation avoids the risks identified in *ACA Int'l*, the Court finds that LiveVox HCI is equipment lacking the capacity to function as an ATDS.

Consequently, the Court rejects Plaintiff's argument that LiveVox HCI is an ATDS because it is an integral part of the LiveVox Platform.

**d. LiveVox HCI has the Capacity to Store Numbers.**

1   Finally, Defendant also argues that LiveVox HCI is not an ATDS because it does
2   not have "the capacity to dial stored numbers automatically." *Marks*, 904 F.3d at 1052.
3   While the Court need not address this argument as its reasoning and findings above are
4   dipositive, the Court nonetheless finds that LiveVox HCI has the capacity to "store
5   numbers" within the meaning of the TCPA. *Id.* at 1053.

6   It is uncontested that the Campaign Database can (and does) store numbers. (ECF
7   No. 25-4, Siegel Depo. at 12–13, 23–24.) The Campaign Database, moreover, is integral
8   to the HCI dialer. (*Id.* at 16–17, 35, 38.) Each client's numbers are uploaded to, and
9   stored by, the Campaign Database. (*Id.* at 12.) Consequently, LiveVox HCI cannot
10  execute its primary function – making phone calls – *but for* the Campaign Database's
11  abilities to "store[] numbers" and to present those numbers to the clicker agents through
12  the ACD. *Marks*, 904 F.3d at 1052; *cf. Castrellon v. Fitness Club Mgmt., LLC*, No. CV
13  17-08825-SJO, 2018 WL 5099741, at *6 (C.D. Cal. June 6, 2018) (finding an equipment
14  did not "store" numbers that it pulled from a database).

15  Defendant's cited cases to the contrary, moreover, are unpersuasive in that they fail
16  to address *Marks*' interpretation of § 227(a)(1)(A) or the integral role of the Campaign
17  Database. *See, e.g.*, *Collins*, 360 F. Supp. 3d at 273 (failing to address the Campaign
18  Database's ability to store numbers); *Fleming v. Associated Credit Servs., Inc.*, 342 F.
19  Supp. 3d 563, 577 (D.N.J. 2018) (relying on legal test not applicable in the Ninth Circuit
20  – i.e. that "numbers [must be] randomly or sequentially generated for" HCI use); *Smith I*,
21  2017 WL 1336075, at *5–7 (focusing on the degree of human interaction).

22  Consequently, because the Court considers the "equipment" at issue to include the
23  Campaign Database, and because the Campaign Database is integral to the HCI's dialer's
24  calling process, the Court finds that the dialer can store numbers within the meaning of
25  the TCPA and *Marks*.

26  **IV. Conclusion**

27  In reviewing the record, the Court finds that the undisputed facts establish that

LiveVox HCI is not an ATDS. While it can store numbers as required by the TCPA, it cannot make non-manual calls as each call requires human intervention. The Court, moreover, rejects Plaintiff's argument that LiveVox HCI has the "capacity" to act as an ATDS because a LiveVox client can easily switch between dialers on a campaign. Here, the "equipment" at issue does not include the other dialers, and thus Defendant's use of LiveVox HCI does not violate the TCPA.

Consequently, the Court **GRANTS** Defendant's motion for summary judgment motion and **DENIES** Plaintiff's motion for partial summary judgment. Defendant's evidentiary objections to Plaintiff's diagram are **DENIED** as moot.

**IT IS SO ORDERED.**

Dated: February 19, 2020

Hon. Gonzalo P. Curiel
United States District Judge

20

18-CV-1562-GPC-BGS